[See Case No. 14,261.]

## Case No. 14,257.

**TURNER v. HAND.**

[3 Wall., Jr., 88.] [2]

Circuit Court. D. New Jersey. Oct. Term, 1855.

WILL—FORGERY—HANDWRITING—TESTATOR'S DECLARATIONS AND SANITY—DEPOSITIONS IN OTHER SUITS.

1. Proof of forgery derived from knowledge of handwriting, though very strong indeed, ought not to control positive, and unimpeached evidence of an actual execution.

2. Strong evidence of the forgery of a will being given, the declarations of alleged testator, after the alleged making of the will, as to the mode in which he had disposed of his property, are evidence, such declarations being offered as a fact or circumstance tending to prove fraud and forgery, by showing that the alleged testator had no knowledge of the existence of such an instrument. But such evidence is not generally admissible; is dangerous in its effect on a jury, and ought to be controlled by the charge and powers of the court.

[Cited in brief in Eddey's Appeal. 109 Pa. St. 420, 1 Atl. 425.]

3. The deposition of a witness, deceased, taken in the prerogative court on a caveat against a will, may be read in an ejectment, where the plaintiff in ejectment claims title under the person who was an executor of the will and propounded it for probate, and where the defendant is one of several caveators: but the record of the court is not evidence to show what the decision was on the validity of the will.

4. On a question of a testator's mental capacity, the court should look to his substantial business acts more than to his conversations, or occasional doings not connected with business. The fact that he is eccentric, excitable, passionate and very nervous;—is on certain subjects believed by many to be insane, through excited feeling—that he believes in spiritualism, the book of Mormon, or in Fourierism; may talk very much like a fool; have visions and believe in them, is not enough to show a want of sound and disposing mind and memory, provided he attends constantly to his business, and manages it with capacity, care and skill; and in other practical respects appears to be of sound mind.

[Cited in Dale v. Dale, 36 N. J. Eq. 280; Eddey's Appeal. 109 Pa. St. 420. 1 Atl. 426; Kingsbury v. Whitaker, 32 La. Ann. 1055.]

This was an ejectment, in which the plaintiff claimed title under one Boylan, whose title depended on the fact whether a certain paper of several leaves, signed on each leaf, and dated January 12th, 1852, was the will of Jonathan Meeker, a man of large fortune in New Jersey, who died in 1853, at the age of seventy-six. The defendant's positions were, (1) that the will was a forgery; (2) that if not actually a forgery, the testator when signing it, had not been of sound and disposing mind. The execution of the instrument having been formally proved by one Mrs. Hoyt and her three daughters, who with her husband, now deceased, professed to be the subscribing witnesses; the defendant thus attempted to prove it an absolute forgery. One Clark had known Meeker for forty years; lived in the next house to him; had seen him write for thirty years; was as familiar with Meeker's handwriting as with his own. "My opinion is he never made one of those signatures. It is plain to me he never wrote them. There is a peculiarity in them not his." Valentine had known Meeker and his writing from his youth up; did not believe the signatures to be his; never had had but one opinion from the time that he first saw them, and that was that the signatures were forged. Bonnell had frequently seen Meeker write; thought the signatures not genuine; thought them in a better handwriting than Meeker's. Wilcox, a justice of the peace, had done business with Meeker for thirty years; had seen him write very often, and did not believe the signatures to be his. Ball, a constable, had known Meeker intimately for fifty years; was in the office of Meeker, who was a magistrate, for thirty-six years, and as constable did his business; was very familiar with his handwriting, and did not believe any one of the signatures to be his; believed every one of them forged. Day, who had had considerable dealings with Meeker, and so was familiar with his handwriting, also believed the signatures forged. Wood had

---

1 [Reported by Hon. William Cranch, Chief Judge.]

2 [Reported by John William Wallace, Esq.]

seen Meeker write frequently of late years, and did not believe the signatures genuine, they having, in his opinion, been written by some hand less tremulous than Meeker's. Runnion, a lawyer, had been frequently employed professionally by Meeker; had often seen him write; had seen him write with all sorts of pens; no signature of his that the witness had ever seen was like any one of those on the paper alleged to be his will. They were all of a hand less steady; and "my opinion is that the signatures are not his." Crane, a Methodist clergyman, had seen him write; had examined the paper several times, carefully; "I do not believe it genuine," he said; "I do not believe any one of the signatures to be his handwriting." Tully, another Methodist clergyman, very intimately acquainted with Meeker, had examined the paper twice before, and had made up his mind as his "deliberate opinion, that Squire Meeker never wrote those signatures." Townley, familiar, &c., thought "the signatures resembled his, but were not his." Crain, familiar, &c., thought them not like any of his of late years, and therefore a forgery. Magee thought the signatures did resemble his, but were not his, being all of them smoother and better than any which the witness had ever seen of his. All these witnesses were intelligent, credible and unimpeached. The paper alleged to be Meeker's will, left the property which was the subject of this ejectment to one Boylan, no relation, and who with Meeker's widow, were sole executors. It did not leave anything, or but a small amount, to a nephew of Meeker's, Jonathan Meeker Muir, hereafter mentioned; nor did it found or endow any Methodist institute, also spoken of hereafter; though it left $1,000 to a Methodist church. His widow was left with a small sum, and his blood relations generally were cut off.

First Point of Evidence. The defendant's counsel now proposed to ask of witnesses this question: "What conversation had you with Jonathan Meeker, before and since February 12th, 1852 (the date of the alleged will), respecting the disposition of his property by will;" the purpose of the question being to give in evidence the declarations of Meeker, both before and after the date of the alleged will, as to the dispositions he had made of his property, and the evidence being offered as a fact or circumstance tending to prove that the testator was ignorant of the existence of any will such as was contained in the paper offered in evidence; that this paper, containing dispositions was wholly incongruous with his often expressed testamentary intentions; and so in connection with other facts proved and to be proved, to sustain generally the issue of fraud and forgery.

Mr. Bradley, against the admission of this testimony, relied much upon the English case of Provis v. Reed, 5 Bing. 435 (15 E. C. L. 658). In that case where the question was as to the due execution of a paper purporting to be a will, proof was offered that the so-called testator had said, "Tom Reed (the defendant in the case) has been trying to get my property; but neither he nor his shall have it. * * * My land goes to my own family. Peggy! (one of the defendants) remember the land is yours. If I don't live to make my will, when I am dead, see that you are righted." The evidence was rejected. Park, J., says: "The evidence of declarations of the testator incompatible with the validity of the will, was properly rejected. When the legislature has taken such care to prevent fraud in wills, and when it is considered how easily declarations may be extorted by artful persons after the intellect of a testator has been impaired by time, it would be most mischievous and a violation of all established principles to allow such declarations to be received in evidence." Of this opinion was the rest of the court. The American case of Jackson v. Kniffen, 2 Johns. 31, in the supreme court of New York, when Kent was chief justice of it, and Livingston and Thompson, justices, is to the same effect; and parol evidence of the declarations of the testator, that he had executed his will under duress and now revoked the same, though these declarations were made in the moment of expected dissolution, and under circumstances of such solemnity that they would have been received on a question of life and death, in a court of criminal jurisprudence, the majority of the supreme court of New York, after full consideration declared them inadmissible: Spencer, J., alone and "with diffidence" dissenting.

GRIER, Circuit Justice. Testimony of the sort proposed is, generally speaking, not admissible; but when you have strong proof that the paper offered as a will is a forgery, and the issue is fraud and forgery, I think it is competent, as tending to prove the issue. It is, however, a somewhat dangerous kind of evidence; and a court must hold a tight rein over it, in charging the jury as to its legal effect, in relation to the positive and unimpeached evidence of execution. Question allowed.

The evidence being ruled admissible, it appeared that Meeker had told Valentine, about the time of the alleged disposition, and also not very long before he died, that he had left a certain ten acres described for the site of a Methodist seminary or institute, and $5,000 for the erection of a building, and $5,000 to endow it; that he had left to his nephew, J. M. Muir, other property worth $10,000. He had told Corey also, that he had left money for the Methodist seminary, but none for the church. To him he had always spoken highly of his family connections, especially of his nephew, Muir, of whom he said that except his own wife, he was nearest to him in his affections, and that he leaned on him as he got old for coun-

sel and for help. Of Boylan he said that he was a "d——d scoundrel, and he would not trust him with a dog's dinner." He told Clark that he had left money for the seminary, though none for the church, because the church society would not come up to his views; that he had left land worth $10,000 to his nephew, Muir; and that Muir and his wife were his executors; that he had kept a will by him for forty years. To Lewis he had said, after the execution of his alleged will, "Do you know Boylan? I would not trust him for one cent. He is the devilishest rascal in the world;" and said that one Hoyt, hereafter spoken of, and Boylan were attempting "to come some game over him," and that he did not mean they should; that he would once have trusted Boylan, and have made a man of him if he had done right, but not now. "He always told me that Muir was to be his chief heir." To Lowe he said, that he had made his will, and had left $10,000 for building and endowing a seminary; $5,000 for each; and getting out a map, showed him the location of the site for it; said that his executors were his wife, Muir, his nephew, and James and Isaac Meeker; that it was the last will he should ever make, as he was old and feeble; spoke of Muir as a very smart man, who had done more for him than all his relations, and to him especially always expressed himself kindly and affectionately; "his blood relations," said this witness, "were a great hobby with him, and he gave as a reason why he would leave me nothing, that I had no Meeker blood in me." Of Boylan he said that he was a d——d rascal, who, while professing to be his friend in a quarrel he had with the town council of Newark, was in fact against him and working for the other side. To Wilcox, whom he met in the street, after February, 1852, he offered to show his will. "It is of no interest I guess, to me," said Wilcox, "since I don't believe you have left me anything." "No," replied Meeker, "I haven't left you anything; for you have no Meeker blood in you. I have left it to my nephews." To Johnson he stated that he had left $10,000 for the erection and endowment of the seminary; and that Boylan was a d——d cheat, who would rob him of all his property if he could; that he had paid him to attend to his business, but that he did not attend to it at all. To Searles, that Boylan was "a nasty, good for nothing, dirty, little puppy"; that he had cheated him out of a place in Newark, and would do the same again if he got a chance. To Runnion, who advised him to have Boylan attend to some business for him, he said, "I won't; he is a villain, a d——d rascal. I have no confidence in him." When Brewer said he did not know Mr. Boylan, "you need not want to know him." replied Meeker, "he is a dishonest man." To Tully, the Methodist clergyman already mentioned, and very intimately acquainted with him, and seeing

him frequently, Meeker, "at every interview in the latter part of his life, uniformly expressed a determination to have the Meeker Institute accomplished. It seemed to be one of the hobbies of his old age."

It would be tedious and of no use to go through all the testimony in the case. Many other unimpeached witnesses were examined for the plaintiff, all of whom testified to the same effect as those whose names have been stated.

On the side of the defendant, it appeared, contrary to what Meeker had stated to the persons last named, as to the disposition of his property; that to Dr. Lord, a physician of character, who had known him very well in the last few years of his life, he spoke disrespectfully of all his relations; said that they wished to rob him; that he had done a great deal for them. Dr. Lord had seen Meeker often at Boylan's office, and had heard him speak of Boylan as "my friend Boylan." He frequently spoke of the Methodist or Meeker Institute, and of his intention to endow it, until the latter part of his life, when he said that he had abandoned the project. He said this in an interview very shortly before his death. To Law he said, that one Whitehead had been his lawyer, but that Boylan was so now; that Boylan had treated him well, and he would remember him for it: to J. A. Johnson, that he meant "to make a man of Boylan, but did not mean that he should know it, as it would make him too saucy;" that his nephew, Muir, did not know how to manage a farm. "He was always complaining," said this witness, "that his relations would not take care of themselves, and that he had helped them until he was tired." To Fort, a Methodist clergyman, who resided about five hundred yards from him, and visited him as a spiritual adviser in his last illness, he said that he had given a legacy of $1,000 each, to two churches, a Presbyterian and Methodist; that his connections were Presbyterian, he himself a Methodist in his opinions; and described the mode of raising the legacies essentially as found in the paper in controversy. Of Boylan he spoke respectfully; called him "my friend Boylan;" said Boylan was doing business for him; wished the witness to become acquainted with Boylan, and offered to give to him a letter of introduction. To Mrs. Trimble he spoke in the kindest terms of Mrs. Boylan; said that she had always treated him most kindly, and that he meant to do something for her husband.

On the matter of the signatures, several witnesses, not the subscribing witnesses, but acquainted with Meeker's handwriting, were examined, all of whom gave their opinions, derived from such knowledge, that the signatures were genuine; most of them thought them his; others thought them like his, and without any great difference from his ordinary signatures; a "little firmer." perhaps,

than in most cases, but no great difference; "a little better than common, perhaps, but his," &c.

The history of the execution of the will, was as follows: Meeker, being aged seventy-six, and in such a state of health and mind as is hereafter mentioned—a feeble bodily health, confessedly—had gone on a cold winter's afternoon, ten or twelve miles from his own house in New Providence, to one Hoyt's, a person of some social condition, with whom he had but recently become acquainted. Hoyt, it appeared, was a garrulous, foolish, lying person, but one whose moral character was not otherwise open to impeachment. Meeker's going so far from home alone, at his time of life, and in feeble health, on so cold an evening, had attracted remark from more than one person along the way who met him, and one of whom had remonstrated with him at the exposure. He went on, however, and reached Hoyt's. Neither Hoyt nor any of his family were related to Meeker, nor they or their relations or friends, beneficiaries under the will, or acquainted otherwise than by name with most of those persons.

The history of the execution of the will was given by a subscribing witness, one of Mr. Hoyt's daughters, essentially as follows: "Mr. Meeker was an acquaintance of father's. He had visited at our house; had dined and taken supper there several times, for some two or three years, perhaps more, before the time I am about to speak of. He executed a paper at our house, which he said was his will. It was in January, 1852, I think on a Monday. He came in a sleigh, with two horses, alone, about dark, about dusk; before tea. He took tea with us. It was a cold, snowy, stormy night. He said he was afraid the storm would spoil his new blue horse-blankets; wind was high. A servant received him at the front door. I saw him first in the dining room. The family were there. The family consisted of my father, mother, two sisters, myself, my aunt and grandmother. I can't recollect whether grandmother was there or not. Father was not at home when Mr. Meeker arrived; he had gone to New York that day, and did not return, I think, until after tea. When father had got his tea, Meeker asked him to go into an adjoining room. After being absent a half hour or more, they came back. Mr. Meeker had a paper in his hand, which he said he wished to execute. He sat down by the table and requested pens and ink to be brought, and that some one of us would witness the will. Before the old man signed it, there was a long discussion about its contents; he read it over loud to us. I think the first thing he remarked on was what he had given his wife. Some one said it was a mere pittance. He said it was more than he had given her in other wills, and was very liberal; that she already had more property of her own than she needed; that he had

given her money for signing papers, which she had laid up. Father said that she had been as economical as he, and had enabled him to grow rich, and ought to have more. What brought father's remark out, was Mr. Meeker's saying that the provision in this will was very liberal. I remember a legacy to some one named Muir. He said that Muir would be expecting more than he got; for he had always been hanging about him; he gave as a reason for not giving him more, that Muir had over-reached him. I recollect a provision for a niece who was in an insane hospital, and a legacy to a colored girl named Violet. (Both these provisions were in the paper in question.) He remarked that he had given his brother nothing, because he had enough already, having only one child, a daughter. Father said that he had given too much to Mr. Boylan. There was a good deal of discussion about him. He said that 'Boylan' was a young man of considerable promise, and he would give him a lift: and that he liked 'Mrs. Boylan.' and urged us to become acquainted with her. Meeker brought the will ready drawn: he said it was drawn by a lawyer in New York. I don't remember his name. When father made a suggestion about Mr. Boylan, the old man said that he had made up his mind before he came and didn't want to be dictated to. I remember one or two bequests to churches; one to a Methodist church. I think. I remember no more except that there were bequests to some of his friends; their names I don't remember. I knew none of them. Father said, jestingly, that he ought to have left us something. He said we had enough already. I remember his saying that he had intended to leave something for a public school, but that he had changed his mind; that they would be ungrateful and would not care for him enough to put a gravestone over him; that he did not wish the people of New Providence to know it, for that if they knew he had left them nothing, they would be mad enough to ride him on a rail. After the pens and ink were brought, he requested my father to write something at the end, which he did. After my father had written what he requested, Meeker wrote his own name. He asked for a seal. I cut the seal paper at his request. He put his finger on it and declared it to be his last will and testament for the purposes therein mentioned. He asked me to witness it; I made some apology and declined. My father proposed to go for some one out of the family; also proposed to take it to a lawyer in Elizabethtown, whom he named, and have it witnessed there. Father said he would rather have nothing to do with the will. The old man objected, said he wanted it executed at our house to keep it a secret; that he wanted a private will; that his relations were always talking about the disposition of his property, and that he was determined to make a will they should know nothing about; that he knew we were not

acquainted with any of his relations, except Mr. Meeker at Elizabethtown. He then asked my sister Anna to witness it. Father and mother both objected, and mother proposed that father should go for Mr. Brown, a neighbor; and I think that father set off, or made some movement to go, but desisted because the old man seemed so vexed about it. It was snowing and cold. He said that any young lady might consider it an honor to be asked to witness his will. After that my sisters signed it. He then asked me again to sign it. He said he had a fancy to my name, that it was the name of his wife. I finally did sign. Father witnessed it. He is now dead. I remember that Mr. Meeker signed his name on several leaves; he said it was the custom, or his fancy. He said afterwards that he wished to have no mistake. He tried several pens to get one to suit him. There were gold pens and quill pens on the stand. I do not know which he used. But he said he could write better than any of us; that he would have to take pains, so many ladies looking on. The will was executed between seven and nine o'clock in the evening. After father, mother, I and my sisters had all signed, it was put under a cover, an envelope, and the old man put it in his pocket-book. All the time that I remained in the dining room, Mr. Meeker was talking about the dispositions which he had made in it of his property. I retired before him. I do not know when he and father retired; I left them, and I think, the rest of the family in the dining room. I saw no more of the will, until two or three weeks after it was executed; when I saw it in an envelope in a drawer in my father's desk, where he kept money and his private papers; and several times afterwards. I saw it whenever I happened to see the drawer opened. I often assisted my father to arrange his papers, and he opened the drawer when he wanted money. It was endorsed 'Jonathan Meeker's will.' There was something written on it about its being opened ten days after the decease (an endorsement which was on the paper in question). The day my father went to the funeral, he proposed to take the will with him and give it to Mrs. Meeker. Mother told him not to do so. Father said he would be glad to get it out of his hands, and that as Mrs. Meeker was one of the executors, she ought to have it. Mother said that as he had taken charge of the document he should do as he was directed, and keep it till the tenth day. Ten or eleven days after Mr. Meeker's death, my father took out the will, broke the seal of the envelope, and requested me to write to Mrs. Meeker, to say that he was going to deposit the will with the surrogate at Newark. I went with him for the ride. I recollect hearing the will read when taken out of the envelope. I recognized it as the one read over at our house by the testator. I have no doubt whatever of its being the identical paper now shown to me, nor that the seal paper is the one which I cut, and the signatures the respective signatures of Mr. Meeker, my father, mother, my sisters and me."

This account was confirmed with slight circumstantial additions and variations by the mother and two other sisters; the father, the remaining subscribing witness, being dead. The narrative of all these ladies was given with great apparent candor, and was not affected unfavorably by long and severe cross-examination. One of the witnesses stated that the signatures were made with a gold pen.

Second point of evidence. The defendant's counsel now proposed to read the depositions of certain deceased witnesses, which had been taken in the prerogative court, in a suit there upon a caveat to this will, it being shown by the record of that suit, that Boylan, who in this suit was grantor, had in that one, as executor of the will, propounded it for probate; and that the defendants here were among the caveators there. The plaintiff's counsel objected to such depositions being read, as the question in the prerogative court regarded personal property and not the realty, and as the record showed that in that suit there were other persons caveators, who are not parties at all in this one.

GRIER, Circuit Justice. The parties were substantially the same, and the issue was the very same, st.: "Is this the last will and testament of Jonathan Meeker?" The record of the prerogative court may be considered in evidence for the purpose of the offer; but not to show what the decision there was as to the validity of the will. Depositions read.

The prerogative court had decided against the genuineness, a fact not allowed to be given in evidence, but one of common knowledge about the place of trial.

In respect to the mental capacity or sound disposing mind and memory of Meeker, the testimony was not perhaps entirely consistent. It showed clearly that he was very eccentric, nervous and excitable; and that he was a man of violent passions and prejudices. A few years before his death, the town authorities of Newark, without his consent, and in violation probably of law, had taken some of his property for a public park; a matter on which he became almost maniacal. "When he got talking on that subject, he became wild," said one witness; "incoherent," said another. "You might as well touch a keg of gun-powder as say 'park' to him," was the testimony of a third. "He became perfectly crazy on the park business; wished to raise an army and make a revolution," said a fourth, who thought him "failing in mind and body, and not fit to attend to any business." Boylan, whose name has been so frequently mentioned, was Meeker's attorney and counsel about the park business: which Meeker, by his will directed should be carried to the courts of last re-

sort. So, too, it appeared that "he was restless and wild about all railroads." "His conversation was frequently incoherent and foolish." He became, at one time, very vehement against the court of chancery; always calling it a court of iniquity. In the time of President Jackson, he had been a great admirer of that gentleman, until, having sent to him a plan for a bank of the United States, without receiving from the president any answer, he became highly offended, and his views of the Jackson policy underwent a complete change. He often adverted with great feeling to the president's breach of decorum in not replying to his letter. At a later date, and not very long before making his will, he told one Love, "of a vision he had had when awake, of a great white throne, on which there were many fine ladies; of all of whom his wife was the prettiest. He (Meeker) was king and she was queen." "He was in earnest," added the witness. About the same time, "he would try to play on Pan's pipes." "He acted strangely," said the witness. "I thought him failing every way, that his mind had failed with his body." On another occasion, "he took out a promissory note for $1,000, and offered to give it to me," said another witness. "I thought him partially deranged on that day." "Towards the close of his life—both before and after he made his will—he had many visionary notions about property; when near seventy-five years old, and failing visibly in body, he talked about his building factories, and having water-powers; he said he wanted to make money—wanted to get rich, and thought he could become so by making spools out of dog-wood."

On the other hand, it appeared that Meeker was naturally "a shrewd, rough man"—"eccentric, but strong minded"—"might have been a superior person, if well educated"— that although he talked very foolishly and wildly, had visions, &c., he acted with sagacity. Hoyt, at one time, wanted to borrow money of him, and used some address to get it without mortgage, but did not; nor did he give the man the $1,000 note which he offered to him. "During all the time near which he made his will," said an intelligent witness, "he was about attending to business. Sometimes he did well enough; generally well enough in ordinary matters. When calm, he knew perfectly what he was doing, and was capable of understanding his relations in life; but when he became excited, he seemed to lose his faculties. The park was the exciting matter; he would become so excited about it, that he hardly knew what he said. But he was not alone in his views about the conduct of the town authorities of Newark, in their mode of obtaining ground for the park. It was an exciting public topic. Town meetings were held to condemn the council; the papers of the day are full of it. No one else behaved, however, like Meeker, who, on that subject,

in my opinion, could not be called sane. On other matters, and especially on matters of property, he acted with sagacity enough."

The testimony as to his conduct on the evening when he came to Hoyt's, and there executed the paper in question, has been given. The witnesses to the will testified in substance that, so far as they could judge, he was a man naturally of a sharp, strong mind, strong will, very positive about his own affairs, but was not excited nor agitated about anything specially on the evening that he was there. He slept there that night, breakfasted there the next morning, and afterwards drove away with Hoyt, the father. His moral character was summed up by one witness. "He was tedious in conversation; dogmatical and arbitrary in all his views; selfish, lying, avaricious, domineering and dictatorial; he hated a poor man, despised his superiors; abused everybody, and spoke well of everybody at different times, according to his humor."

After argument the jury was thus charged by—

GRIER, Circuit Justice. The issue is whether this paper of 12th of January, 1852, purporting to be the will of Meeker, is his will or not. It is an issue of fact, and one to be resolved by the jury on their own responsibility.

I need not, perhaps, remind you, that in order to perform the duty which you have sworn to perform, in rendering a true verdict, in this case, it will be your duty to apply the principles of law involved in it, and weigh the testimony which was had before, with cool, calm and unprejudiced minds. Let no pressure of public opinion—no rumor which may have come to your ears of the supposed decision of any other tribunal, have the slightest effect or influence on this case. There is no greater evil in the administration of justice than that men's liberty or property should become the sport of mere popular impulse or public prejudice.

There is another principle that never should be forgotten by jurors and judges, and one which I know by experience, we are sometimes tempted to overlook—viz.: That we are performing a duty entrusted to us by the law, not exercising an irresponsible power. The rights of property depend upon the law, and not on the caprice or discretion of a court or jury. The law gives to every man the right of disposing of his property by deed or by will. And if the instrument by which this disposition is executed be in due form of law, by a man of sound and disposing mind and memory, without fraud or coercion practiced on him, neither court nor jury have a right to set it aside, on the supposition they could make a more just and equitable disposition of his property. The law has not committed to us the power of disposing of men's property as we please. That courts and juries are sometimes tempt-

ed to forget this principle my experience has amply shown me. I have seen it in the jury box—I have seen it on the bench—I have felt it—I have had to struggle against the feeling. We easily believe what we wish to be true. We are prone to be satisfied with light proof, or any fallacy in favor of a preconceived opinion, prejudice or feeling. When we suffer ourselves to be thus tempted, we act as tyrants, not as judges.

The question for your decision then, is, did Meeker sign, seal and publish this instrument as his last will and testament? If the testator in the right use of his faculties has executed the instrument in due form of law, it is not in the power of court or jury or both together to treat it as null and void, and make a different disposition of his property to suit our notions of justice or propriety. A rich old man may marry a young wife or a handsome and obliging housekeeper, or maid servant—he may disinherit his own children and leave them beggars. You and I may think his conduct oppressive and unjust in the highest sense; yet if it be his will, we have no power to set it aside. It is true a will may be so outrageous, so contrary to the known desires and wishes of a testator, so absurd on its face, as to indicate or even demonstrate the want of sanity in a testator who could be guilty of signing such an instrument. But it must be a very extreme case to justify the rejection of a will on this account. It would be a very dangerous practice if courts were to allow the parol declarations of a testator to be given in evidence to a jury in order to set aside a legally attested will. Why does the law require certain solemnities in order to a valid testamentary disposition of property? It is because of the fraud and perjuries which would be a necessary consequence of suffering a man's property to be the sport of loose conversations. Old men who have the misfortune to be rich and childless are often so situated, that it becomes necessary to their peace and comfort, that they should conceal their intentions entirely from the wide circle of collateral relatives, beggars for the church, and others of like character. His parol declarations may be, and often are made, directly contrary to his real and secret intentions, and for the very purpose of concealing, not of testifying his mind or intention. Hence many judges have wholly refused to suffer such evidence to go before a jury for any purpose whatever, as tending to introduce the very evils which the statute of wills was made to guard against. Our titles to land should not depend on hearsay, for next to mere opinions, the testimony of conversations is a species of evidence the least to be relied on. (1) It cannot be contradicted; the witness may give the widest stretch to his fancy or imagination, and he cannot be convicted of perjury. (2) Very few persons can recollect or repeat verbatim what they have heard another say. A witness gives his own version, in his own words, of general impressions, rightly or wrongly received. (3) The witness may recollect a part of a conversation, and yet that part may be an entire misrepresentation of the whole. (4) He may omit very small, but very material words, such as "if," "not," &c., which entirely alter the whole complexion and meaning of the conversation—make absolute what was conditional, and positive or affirmative that which was negative. I must say, after long experience, that I always deeply regret to see rights of property, or men's lives, or liberty, to depend in any measure upon testimony of this nature.

You may then very naturally inquire if such be the law with regard to wills, and such are the dangers to the rights of property from admitting the declarations of testators to be given in evidence to affect their written will proved in due form of law, why has the court permitted such testimony to be laid before the jury? It is right, therefore, that the court should explain to you on what principle this was done, that you may give this evidence its proper weight and application, and not be led into error by an improper appreciation of it. While it is undoubtedly true that parol declarations of a testator made before or after executing his will, ought not to be received as a ground for altering or annulling it, yet cases may arise where such declarations, in connection with other circumstances, may be taken into consideration, as for example, where there is strong evidence of conspiracy and of fraud practiced on the testator, or that the instrument is forged and false.

In order to elucidate this principle, let us suppose a case. A will is produced in court, regularly proved according to law, yet notwithstanding the legal proof, it may possibly never have been seen by the testator, never have been signed and sealed by him, and, consequently, does not contain his will as to the disposition of his property. Suppose it to have been made (as has sometimes been the case in Ireland and other places) by some person personating the testator, and simple, and perhaps honest people, have thus been prevailed upon to attest it. In such a case, the signatures may be so palpable a forgery as at once to detect the fraud to any judge of handwriting. Again, suppose the will disinherits a child, a grandchild, or other relative, who has been the favored and beloved companion of the testator's life, whom he had uniformly pointed out, and always, and invariably, through his whole life, declared his intention of making his heir, and in whose favor a prior will was duly executed. Suppose the devisee in this supposed will was some worthless fellow, unknown to the testator, or, if known, despised or abhorred by him. Suppose the witnesses to be of the same character, low and degraded, with whom the testator never associated. Would

not such facts, if clearly proved, condemn such instrument in the mind of every rational man? Would not the moral impossibility that the testator could ever have made such a disposition of his property, be sufficient to outweigh the positive testimony of such witnesses? It is easy to forge the handwriting of almost any man, so that it may be almost impossible for the best judges to discriminate between the false and the true, and it is too true, that persons may be found willing, for a sufficient consideration, to swear to any statement of facts. Fraud can be generally proved only by circumstantial evidence. A number of distinct facts, clearly proved, may be so utterly inconsistent with the truth of the instrument, as most satisfactorily to establish the fraud. The fact that the testator had uniformly, through his whole life, declared that he intended a certain relative to be his heir, that he made his will in his favor, may be an important link in the chain of circumstances from which fraud, perjury, conspiracy, and forgery, may be clearly proved.

It was for this reason, that when the defendants opened their case, and proposed to prove fraud and forgery by a chain of similar circumstances, the court permitted this testimony of the declarations and conversations of the testator to be given in evidence.

Let us now proceed to a more particular examination of this case. In doing so, it is not our intention to examine or compare the immense body of testimony, relevant or irrelevant, with which this case has been encumbered. But we think it our duty to notice some of the leading facts of the case, hypothetically, and to point out to you the weight and effect these should have on your verdict, accordingly as you may find them to exist.

How, then, shall we take up this immense mass of testimony, to avoid confusion of ideas, and give to the testimony its due weight and effect? 1st. For this purpose, you will first examine the testimony in support of the will. Is it sufficient in law, and credible, so that standing alone, the will ought to be established without hesitation? 2d. What is the defence set up against this paper? Is it so clearly established by evidence, as to convince our minds that the testimony given in support of the will is false, and that there is a chain of undoubted circumstances, which makes it morally impossible for the jury to believe the witnesses to the will, or that this paper contains the true will or intentions of the testator?

You must remember, that the burthen of proof is on the party who alleges fraud. That fraud, though proved by circumstances, can never be presumed—for fraud is a crime. It is not enough to show suspicious circumstances. Suspicion is not proof. It does not require a great deal of ingenuity to cast suspicion of fraud upon any transaction. There is a very great and sometimes grievous error into which not only the public mind, but that of jurors and judges too, are apt to fall; and which leads to false judgments, and sometimes to great oppression. I would, therefore, specially call the attention of the jury to it, and caution them to beware of it. It is this: The law abhors fraud. Every honest mind hates it, and even those who practice it themselves, will join in the denunciation of it. It makes them feel virtuous for the time, and they are the most ready, from the arguments of conscience, from judging of others by themselves, to believe it true, and inveigh most loudly against it. When the clamor of fraud is raised in a community, or when it is confidently charged by counsel in a court, we are prone to see all facts through a false medium, which magnifies the importance of every fact from which suspicion of fraud may be raised, and ignores the plainest inference against it. In the midst of our virtuous indignation against fraud, we first assume it has been committed, and then seek for arguments to confirm, not our judgments, but our prejudice. "Trifles, light as air," then become "strong as proofs of holy writ." Circumstances which to an unprejudiced mind are just as compatible with innocence as guilt; which at best could only raise a suspicion, are set down as conclusive evidence of crime. Those who sit in judgment over men's rights, whether as courts or jurors, should beware of this natural weakness to which we are almost all of us subject. We all fancy ourselves wiser than perhaps others are willing to give us credit for. This feeling is gratified by what we believe to be superior sagacity. Rogues may be cunning, but they can't deceive us. Under this satisfactory belief, we become over-astute, and often see that which is not to be seen. We suffer our imaginations to take the rein from our judgments, and rush headlong in this chase after the fox called fraud. Circumstances which should avail for the proof of fraud, are such only as are inconsistent with a contrary view of the transaction, and lead irresistibly to that conclusion.

We have before us a will proven by five witnesses, all present at its execution, and all agreeing in every material circumstance which can affect its validity. You must bear in mind, that the best possible evidence of the execution of any instrument of writing, is that of the subscribing witnesses and other persons present, who swear that they saw it signed. They swear to facts, and not to opinions, and if they are credible witnesses, whose character for veracity stands unimpeached, it is the only safe and reliable evidence of the execution of such instrument. One witness, Hoyt, although a man of some pretensions to respectability as regards his family, station in society, and connections, is proved to have been a talking, babbling man, whose statements of facts are not much to be relied on; and if the fact of the execution of this will depend-

ed on his testimony alone, the jury might well consider it insufficient to satisfy their minds as to any doubtful matter. But the material portions of his testimony are completely corroborated by the testimony of four witnesses, whose characters are wholly unimpeached. Their standing, their education, their manners, are of the best in society. They relate facts and circumstances which it was impossible for them to know if not true. They have been put on the stand, face to face with the jury. They have undergone a most stringent and searching cross-examination by most able and ingenious counsel. This forms the best possible criterion to judge of the value of testimony. It is hard even for the most experienced and hardened villain to stand such a test. You have seen their conduct, manners, and countenances. You have heard their answers. Were they such as to give confidence in their candor and truthfulness? Have they contradicted themselves or one another in material facts? They make wrong guesses as to length of time; they may have differed with the house servants as to some immaterial circumstances—whether tea was over, &c. Such discrepancies will always occur in the testimony of the best men, when cross-examined as to a thousand minute collateral circumstances. If such small matters should discredit a witness, we should have little or no reliable testimony in a court of justice. Each one of these witnesses testifies distinctly, that Meeker did execute this paper, and did, in their presence, publish it as his last will and testament—that he was in the full use of all his faculties; of sound and disposing mind and memory. They relate his conversations at the time, which prove not only the fact of his sanity at the time, but that this paper contains the disposition which he then intended to make of his property, and is the identical paper which they saw executed. These witnesses have either sworn what is true, or they have conspired together to commit the grossest perjury. Any other hypothesis is sheer fancy and imagination, conjured up by the ingenuity of counsel to avoid the direct accusation of a crime, which the charge of fraud relied upon in their defence, indirectly asserts.

In order to establish this charge the testimony of defendant must be sufficient to convince your minds by satisfactory evidence. That these four ladies of unimpeachable characters were morally capable of conspiring together to commit perjury in order to sustain a forgery; and that, too, of an instrument which is of no benefit to them, but to enrich a person who was a total stranger to them—this may almost be said to be a moral miracle. But supposing them morally capable of such a conspiracy, you must be convinced also that these ladies were capable of concocting and arranging a false story so perfectly, that the most scrutinizing cross-examination of counsel cannot convict them of their guilt; and of being able to narrate this story with all its circumstances, with all appearance of artless simplicity and truth, and without a blush or tremor—a task which the most practised, astute and abandoned knaves in the community would be incapable of performing. The evidence to establish such a belief must be facts clearly and indisputably proven, which when arrayed together form a chain of circumstances incompatible with any other solution than the falsehood of this testimony.

Opinions with regard to handwriting are the weakest and least reliable of all evidence as against direct proof of the execution of an instrument. Generally, when the jury have acknowledged signatures for comparison, they can judge as well of the character of the disputed signature as if they had seen the party write an hundred or a thousand times. It is but an opinion formed from comparison simply. The witness compares with his remembered original—the juror has actual original before his eye. Tell a man that a person's name, with which he is acquainted, has been forged, and nine cases out of ten, he will be astute enough to fancy he discovers some marks of it. If it be a good forgery, very few men are able to detect it; and hence other witnesses not prepared beforehand to pronounce it such, will very truly say they would take it to be his signature. But there may possibly be such glaring marks of forgery on the face of an instrument as to condemn it, especially if proved by witnesses of doubtful character, and connected with other suspicious circumstances as to the persons and place where it had its origin, and these marks may be so strong, and circumstances so convincing, that a paper may be pronounced a forgery in the face of the testimony of witnesses whose previous character cannot be otherwise impeached. You have the paper before you and numerous acknowledged signatures of the testator, and you must judge whether there is such evidence of forgery on the face of it, as either of itself, or in connection with clearly established facts, to entirely destroy the credibility of the testimony to its execution. Is there any thing in this will so surprising and so unnatural, and so inconsistent with the known desires and intentions of the testator, as to make it impossible to believe it the work of the testator? Had he ever any certain, consistent and continued plan and determination for disposing of his estate from which he never deviated? Has he taken more from his heirs in this will than in some others? If his declarations, permitted to be given in evidence in this case, do not prove that, they prove nothing. So, too, one single declaration acknowledging the provisions here made as his will, entirely annuls them, and corroborates the will. If it be true that the testator was continually changing his will;

continually talking about it, and boring his friends and acquaintances to write new ones for him; if in the midst of his avarice and stinginess, he was trying to get services and attentions from his friends and relations for nothing, by means of promises, and exciting hopes of being remembered in his will; talking loosely, telling lies; if his declarations of intentions were sometimes consonant with the provisions of one will, and sometimes of another; if you believe that he had the slightest motive to keep people in the dark as to the real contents of his will; if he was trying to curry favor to his other plans in life, or satisfying his vanity by magnificent prospects for charitable purposes, to be executed after his death, while he was too stingy to part with a dollar in his lifetime; if he had one great passion of his life, to wit, the defeating what he and many others very justly considered a high-handed and oppressive seizure of his property for no great public use, but rather for the convenience of the people of Newark, or some of them; if this will conforms to his expressed intentions on that subject of his ruling passion; then all his declarations tending to impeach this will, amount to nothing. They rather strengthen than impugn the paper in question.

It is not the intention of the court to dwell upon, or even notice the thousand and one minor issues with regard to facts, which if unexplained, tend at the farthest only to cast some suspicion upon the conduct of that chattering busybody, Hoyt, the witness who is impeached. Those who charge fraud are bound to prove it by circumstances or evidence which will lead our minds to certain and definite conclusions. All the facts must point to one focus, making it bright as day. If the supposed facts are capable of being reconciled with innocence, or if they cross the path of each other, pointing to different hypotheses, and proving and centering on no one conclusion, they cannot be relied on as proving anything.

To give force and application to the suspicious acts alleged by counsel, they have at one time to assume the hypothesis that Hoyt, with little or no acquaintance with Boylan, or without any combination or conspiracy, or even suggestion or promise from him, had volunteered to commit a forgery and to seduce his innocent and respectable wife and daughters to commit perjury in support of it; and this, too, in the hopes that Boylan might perchance reward him for his fraud. Hoyt has been proved to have been a blattering busybody—not to be trusted in money matters, or in his narrations of fact; but I do not know of any proof, that he was so arrant a fool, or so heartless a villain, as to execute such a piece of gratuitous villany; and it lies upon those who allege it to prove it beyond a doubt by clear and indisputable evidence. Casting a cloud of suspicion on a man, by ingenious insinuations of how he might possibly have been guilty—the noise and confusion of loud and clamorous charges of fraud—will not amount to proof.

Another hypothesis is, that Boylan and Hoyt conspired together and had this forgery executed and perjuries prepared. This supposition differs from the other, in that it alleges some motive for a conspiracy between parties who may have agreed, although there is no evidence of that, to divide the spoil obtained by their mutual villany. But it carries with it also this evident difficulty, that while Hoyt's unfortunate character was such that you might impute any act of dishonesty to him with some probability of credence, the hypothesis compels the party making it, to furnish clear and distinct evidence that Boylan, a man of fair standing in the honorable profession of the law, has committed a base forgery, and conspired to defraud the heirs of Meeker out of their property. Have you any clear, distinct or reliable evidence to establish the commission?

The dictum of an ecclesiastical judge which has been read to you, may be law in courts where the clergy execute the laws. But it never can be received in a common law court. You are called upon to decide an issue of fact. The defendants have undertaken to prove this will a forgery; you have to try that issue and find it true or false. You are not called upon to choose between two wills, and to say which must be admitted to probate. An ecclesiastical court may assume like cadis or sultans to dispose of rights of property on principles of compromise and convenience, without troubling themselves to find out the truth as to a contested instrument. But juries in a common law court exercise no such irresponsible power to dispose of men's property by such compromises to save themselves trouble of investigation. They are sworn to give a true verdict, a verdict according to law—to say the truth on the issue. If the instrument in dispute, which conveys a title to valuable property to the plaintiff, be a true one, the jury are bound to find a verdict for him. If, on the contrary, it has been proved to be a forgery, they must say so, however it may affect the reputation of the parties or pretended and false witnesses. There is no middle way, no shuffling off the responsibility, "that jurymen may dine."

I come now to the second point: Was the testator at the time of executing this will of sound and disposing mind and memory? This point, of course, is not necessary for you to consider if you believe the will to have been a forgery.

The general rule of law on this subject is as follows: "Every man is presumed to possess a sound mind till the contrary be shown; and it is incumbent on the party alleging insanity to establish the fact. If general insanity be proved, it is presumed to continue till a recovery be shown; and the

party alleging a restoration must prove his allegation. Insanity at the time of making an alleged will must be proved in order to render the instrument void." Grabill v. Barr, 5 Pa. St. 441. The same rule is stated in the remarks of the late Justice Washington, in Stevens v. Vancleve [Case No. 13,412], in our own court. He must have memory. A man in whom this faculty is totally extinguished cannot be said to possess understanding to any degree whatever, or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease. He may not be able, at all times, to recollect the names, the persons, or the families of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had been before asked and answered; and yet, his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of; and there is probably no person who has not arranged such a disposition in his mind before he committed it to writing. More especially, in such a reduced state of mind and memory, he may be able to recollect and to understand the disposition of his property which he had made by a former will, when the same is distinctly read over to him. The question is not so much what was the degree of memory possessed by the testator, as this—Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath; the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligent form: Were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged, at the time when he executed his will?

Now, although we have the opinion of certain witnesses that Meeker was a monomaniac on a certain subject, yet when it comes to be explained, it furnishes no evidence that he was insane, nor does it contradict in the least the idea that he enjoyed the use of his faculties, and was of sufficient understanding to manage his concerns and transact his business with his usual shrewdness to the day of his death. Witnesses often use phrases with very indistinct notion of their meaning, and give opinions without any facts to justify them. It is in evidence that the testator was of strong mind, but very eccentric, obstinate and opinionated; but no witness has shown facts from which a loss of a sound and disposing mind and memory could be inferred. His mind was greatly excited on a particular subject—his park property—he was very stingy and set a high value on his rights of property. But it is no evidence of any mental delusion that he thought this seizure of his property without his consent, a highhanded exercise of power—an outrage on his rights—unconstitutional—worse tyranny than the tax on tea which caused the Revolution. That it became his hobby; made him very troublesome, and a bore to all his acquaintances and friends, is of no importance at all, in the matter trying before you, if he retained his memory and his usual shrewdness in the management of all his other concerns. Many a man has some hobby, and may ride it very much to the annoyance of others, and yet be perfectly capable of managing his own affairs, and disposing of his property by deed or will. He may believe in spiritualism, the book of Mormon, Fourierism, or any other of the absurdities of the day which infest the brains of fanatics. He may talk very much like a fool, as you or I may think, on these subjects, and unduly magnify their importance. He may profess an absurd fondness for music, and play the Pandean pipes, behave like a fool occasionally; may tell his dreams and call them visions, and may believe in them; he may be addicted to telling lies about his will, yet, gentlemen, we could not on these accounts pronounce him unfit to manage his affairs, or dispose of his property in his lifetime; and could not avoid his deeds nor condemn him to a lunatic hospital, as a fit tenant for such an institution. So all that is proved makes it no reason for regarding him as not of disposing mind and memory, and to set aside his will. He appears to have been shrewd enough not to lend his money or sell his property on doubtful security, notwithstanding the arts of Hoyt to prevail upon him to do so.

There are cases indeed where an improper influence is brought to bear on the mind of one whose mental capacity is naturally weak, or where the mind is impaired by age, intemperance or disease, but where testamentary acts which might otherwise perhaps be good, will be set aside. The persons in such a case have been imposed on; they have no will, and the instrument to which their signatures have been obtained, may be said not to contain their will, but that of those who procured it to be executed. But I am bound to say to you, that there is no evidence in this case which would justify a verdict against this will on that account.

Verdict in favor of the will.

---

TURNER (HODGSON v.). See Case No. 6,-570.

TURNER (HUBBARD v.). See Case No. 6,-819.